# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Mar 01, 2024**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.
Items seized from Matthew Gillum on February 28, 2024 )        2:24-sw-0220 DB
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____EASTERN_____ District of _____CALIFORNIA_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1957 | Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity |
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy |

The application is based on these facts:

See Affidavit of IRS-CI Special Agent Christopher Fitzpatrick

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Christopher Fitzpatrick

*Applicant's signature*

IRS-CI Special Agent Christopher Fitzpatrick

*Printed name and title*

Sworn to before me telephonically and signed

Date: _____03/01/2024_____

City and state: ___Sacramento, California___

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT OF IRS-CI SPECIAL AGENT CHRISTOPHER FITZPATRICK

I, Special Agent Christopher Fitzpatrick, being duly sworn, hereby depose and state as follows:

## PURPOSE

1. This Affidavit is made in support of a search warrant for personal effects seized from Matthew Gillum on February 28, 2024, as further described in Attachment A.  I assert that there is probable cause to believe that the personal effects of Gillum, including at least one cellular telephone, contain evidence of criminal violations of 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity) and 18 U.S.C. § 1956(h) (money laundering conspiracy).

## AGENT BACKGROUND

2. I am a Special Agent with the Treasury Department, Internal Revenue Service - Criminal Investigation ("IRS-CI") and have been so employed since September 2001.  I am currently assigned to the Sacramento office and I am charged with the investigation of money laundering activities in the Eastern District of California, and elsewhere.

3. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

4. Where I describe statements made by other people (including other law enforcement officers), information contained in reports and/or other documents or records in this affidavit, that information is described in sum, substance, and relevant part.  This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

///

///

## STATEMENT OF PROBABLE CAUSE

*Gillum arrested at Sacramento International Airport.*

5. On February 28, 2024, I obtained a federal arrest warrant for Matthew
   Gillum for engaging in monetary transactions in property derived from
   specified unlawful activity, in violation of 18 U.S.C. § 1957.  2:24-MJ-0023-
   JDP.  The affidavit in support of the criminal complaint is incorporated by
   reference and attached as Attachment C.

6. At approximately 1:45 p.m., on February 28, 2024, law enforcement observed
   Gillum exit Gate #2 from disembarking American Airlines Flight #2248.
   Gillum was wearing a backpack and using a cell phone.  Approximately 25
   yards from Gate #2, law enforcement took the phone Gillum was holding and
   the backpack Gillum was wearing from him, placed him in handcuffs, and
   took Gillum into custody without incident.

7. After Gillum was arrested, law enforcement took him into a room utilized by
   the Sacramento County Sheriff's Department – Airport Division. While
   walking Gillum to this room, Gillum made unsolicited comments stating
   multiple times something to the effect that he had not done anything wrong
   for the past four years.  Gillum also told law enforcement that he had checked
   a bag in addition to the backpack on his person.  Sacramento County Deputy
   Scott Brown retrieved Gillum's checked bag and brought the bag into the
   room occupied by Gillum and others.

## CELLULAR PHONES, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

8. As described in Attachment B, this application seeks permission to search for
   items in data from cellular telephones and any other electronic storage
   devices.  The warrant applied for would authorize the seizure of electronic
   storage media, electronically stored information from that storage media, and
   potentially, the copying of electronically stored information from that storage
   media, all under Rule 41(e)(2)(B).

9. *Forensic Evidence.*  As further described in Attachment B, this application
   seeks permission to locate not only files that might serve as direct evidence of
   the crimes described in the warrant, but also for forensic electronic evidence

that establishes how the phone was used, the purpose of its use, who used it, when it was used, and/or where it was used.

10. Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of criminal conduct under investigation, thus enabling the United States to establish and prove each element, or alternatively, to exclude the innocent from further suspicion. Information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information that can indicate when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime

(e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

11. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

12. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

13. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying the phone and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer assisted scans of the entire medium, that might expose many parts of the internal memory to human inspection in order to determine whether it is evidence described by the warrant. The authorization of this examination extends to any agency or party working at the direction or request of the FBI, regardless of the jurisdiction or physical location of the agency or party.

///

///

///

## **CONCLUSION**

14. Based on the above information there is probable cause to believe that Gillum's personal effects, including any electronic devices, (as further identified in Attachment A) will have evidence of Gillum's violation of 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity) and 18 U.S.C. § 1956(h) (money laundering conspiracy).  I hereby request that a search warrant be issued for the phones identified in Attachment A for the items described in Attachment B.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

/s/ Christopher Fitzpatrick
_____
CHRISTOPHER FITZPATRICK
IRS-CI Special Agent

Sworn to me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on March 1, 2024,

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

Approved as to form:
_____
JUSTIN LEE
Assistant United States Attorney

# ATTACHMENT A

## *Location to be searched*

All items seized from Matthew Gillum on February 28, 2024, at Sacramento
International Airport, including:

1. One cellular telephone seized from Gillum's hand;
2. One backpack that Gillum was wearing on his person;
3. One black duffel bag wrapped in white plastic.

This includes any electronic devices contained within Gillum's backpack and duffel
bag.

## ATTACHMENT B

*Items to be seized*

This search warrant grants authority to seize all evidence of violations of 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity) and 18 U.S.C. § 1956(h) (money laundering conspiracy), including all of the items set forth below:

1. Any and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephones or on a server and associated with the mobile telephones, including:

   a. Incoming call history;

   b. Outgoing call history;

   c. Missed call history;

   d. Outgoing text messages;

   e. Incoming text messages;

   f. Draft text messages;

   g. Telephone book;

   h. Data screen or file identifying the telephone number associated with the mobile telephone searched;

   i. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

   j. Voicemail;

   k. User-entered messages (such as to-do lists); and

   l. Stored media such as photographs, video, or audio recordings.

2. Any information related to email account used by Gillum.

3. Any passwords used to access the electronic data.

4. Any photographs or video depicting controlled substances, currency, user names, passwords, financial records, or items tending to establish the location or control of assets.

5. Any records, communications, or writing related to the acquisition, disposition, or current storage location of cryptocurrency, currency, financial instruments, or other assets.

6. Any records of domestic or international travel.

7. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

# Attachment C

**AFFIDAVT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Christopher Scott Fitzpatrick, having been duly sworn, state as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Treasury Department, Internal Revenue Service - Criminal Investigation ("IRS-CI") and have been so employed since September 2001.  I am currently assigned to the Sacramento office and I am charged with the investigation of money laundering activities in the Eastern District of California, and elsewhere.  I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations and make arrests for federal felony offenses.  Additionally, I am a Federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request a search warrant.

2.      I was trained at the Federal Law Enforcement Training Center located in Glynco, Georgia.  I received specialized training in search and seizure law, financial investigations to include money laundering, and many other facets of white-collar crime enforcement.

3.      In the course of my employment with the IRS-CI, I have conducted or been involved in more than 100 investigations of alleged criminal violations, which have included, but not limited to: money laundering (18 U.S.C. §§ 1956, 1957); importing controlled substances (21 U.S.C. § 952); and distributing controlled substances (21 U.S.C. § 841(a)(1)).  Most of these investigations focused on individuals deriving property from illegal activity. I have participated in federal and state search warrants involving the seizure of property related to the aforementioned criminal violations.

4.      To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, various types of infiltration, including undercover agents and cooperating sources.  Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I am familiar with the methods used by white-collar criminals and drug traffickers to launder proceeds and hide assets.

///

///

## II.   PURPOSE

5.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This Affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.  Rather, I make this affidavit in support of a criminal complaint and arrest warrant for Matthew Luke GILLUM (GILLUM).  Based on the facts set forth in this affidavit, I submit that probable cause exists to believe that GILLUM violated 18 U.S.C. § 1957 (engaging in monetary transactions in criminally derived property).[1]

## III.   TECHNICAL TERMS

6.      Digital currency (also known as crypto-currency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e. currency created and regulated by a government.)  Digital currency exists entirely on the Internet and is not stored in any physical form.  Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Digital currency is not illegal in the United States and may be used for legitimate financial transactions. However, digital currency is often used for conducting illegal transactions, such as the sale of controlled substances.

7.      Bitcoin is a type of digital currency.  Bitcoin payments are recorded in a public ledger that is maintained by peer-to-peer verification and is thus not maintained by a single administrator or entity.  Individuals can acquire Bitcoins either by "mining" or by purchasing Bitcoins from other individuals.  An individual can "mine" for Bitcoins by allowing his/her computing power to verify and record the Bitcoin payments into a public ledger.  Individuals are rewarded for this by being given newly created Bitcoins.

8.      An individual can send and receive Bitcoins through peer-to-peer digital transactions or by using a third-party broker.  Such transactions can be done on any type of computer, including laptop

---

[1] As discussed in greater detail below, the criminal derived property are proceeds of a specified unlawful activity - Title 21, U.S.C. §§ 841(a)(1) (manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance) and 846 (conspiracy)

computers and smart phones.

9.      Bitcoins can be stored in digital "wallets."  A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger.  To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key.")  The public address can be analogized to an account number while the private key is like the password to access that account.

10.      Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not recorded.  If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

11.      Through the dark web or darknet, i.e. websites accessible only through encrypted means, individuals have established online marketplaces, such as the Silk Road, for narcotics and other illegal items.  These markets often only accept payment through digital currencies, such as Bitcoin.  Accordingly, a large amount of Bitcoin sales or purchases by an individual is often an indicator that the individual is involved in narcotics trafficking or the distribution of other illegal items.  Individuals intending to purchase illegal items on Silk Road-like websites need to purchase or barter for Bitcoins.  Further, individuals who have received Bitcoin as proceeds of illegal sales on Silk Road-like websites need to sell their Bitcoin to convert them to fiat (government-backed) currency.  Such purchases and sales are often facilitated by Bitcoin exchangers, such as Coinbase and Kraken.  Both Coinbase and Kraken allow individuals to buy and sell different forms of cryptocurrency, such as Bitcoin, for a fee.

12.      Dark web sites, such as Silk Road, operate on "The Onion Router" or "TOR" network.  The TOR network ("TOR") is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users.  TOR likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the TOR network.  Such "hidden services" operating on TOR have complex web addresses, which are many times generated by a

1  computer algorithm, ending in ".onion" and can only be accessed through specific web browser software

2  designed to access the TOR network.

3                    **IV.    FACTS ESTABLISHING PROBABLE CAUSE**

4     **A.  Prior Federal Investigation of GILLUM and others**

5         13.    On or about July 23, 2013, Matthew GILLUM ("GILLUM") was arrested pursuant to a

6  Criminal Complaint in Support of Arrest by a Postal Inspector with the United States Postal Inspection

7  Service located in Sacramento for various federal violations to include 21 U.S.C. § 841(a)(1)

8  (Distribution of Marijuana), 21 U.S.C. § 843 (Unlawful Use of Mails), 21 U.S.C. §§ 846 and 841(a)(1)

9  (Conspiracy to Distribute Marijuana), and 31 U.S.C. § 5324(b)(2) (Avoid Currency Transaction Report

10  Requirement).  See 2:13-MJ-0223 KJN.[2]

11         14.    Based upon a review of the affidavit in support of the criminal complaint, I am aware of

12  the following.  In August 2012, an investigation was initiated by the United States Postal Inspection

13  Service located in Sacramento into multiple Express Mail packages that were sent into the Sacramento

14  region which contained large sums of U.S. currency.  The investigation disclosed that GILLUM and his

15  conspirators opened at least fourteen P.O. Boxes in the greater Sacramento area using fictitious business

16  names to receive drug proceeds.  Law enforcement identified over 400 Express Mail parcels associated

17  to GILLUM which were mailed into the greater Sacramento area to post office boxes controlled by

18  GILLUM or one of his conspirators that originated from sixteen different states.  On March 20, 2013, a

19  federal search warrant was executed at GILLUM's residence located in Loomis, California.  As law

20  enforcement approached GILLUM's residence, GILLUM and others were actively destroying evidence

21  on two cell phones and it was suspected that GILLUM destroyed other evidence just prior to law

22  enforcement making contact with him at his residence.

23         15.    During the United States Postal Inspection Service investigation into GILLUM's DTO,

24  law enforcement seized over $300,000 in cash, a diamond ring worth more than $100,000 and other

25  expensive jewelry.  The United States Postal Inspection Service believed that GILLUM controlled a

26  substantial amount of virtual currency (Bitcoin) that he had purchased with drug proceeds, but were

27  ──────────────

28       [2] GILLUM remained in custody from the time period he was arrested on or about July 23, 2013, up until
he was released from the Federal Bureau of Prisons in or about November 2019, to a halfway house.

4

unaware of its location.  As set forth above, this was partially due to the fact that GILLUM had destroyed electronic evidence as referenced above as law enforcement approached GILLUM's residence during a federal search warrant on March 20, 2013.

16.    According to an Information filed in the Eastern District of California on December 9, 2013, GILLUM pleaded guilty to one count of 21 U.S.C. § 846 (Conspiracy to Distribute Marijuana) and one count of 31 U.S.C. § 5324(b)(2) (Avoid Currency Transaction Report Requirement).  See 2:13-CR-0393 KJM

17.    According to the Plea Agreement filed in the Eastern District of California on February 6, 2014, GILLUM admitted to the following.  In regards to the conspiracy to distribute marijuana, GILLUM admitted that he was the leader of a drug trafficking organization ("DTO") that operated in the greater Sacramento area.  The GILLUM DTO shipped marijuana, a Schedule I controlled substance, through the United States mail from California to various locations outside of California.  During the one year period beginning in August 2012 and ending in July 2013, the United States Postal Inspection Service identified over 400 Express Mail parcels associated with the GILLUM DTO that were shipped between the Sacramento region and sixteen different states.

18.    GILLUM also admitted that the GILLUM DTO solicited marijuana orders via the Silk Road marketplace operating on the dark net.[3]  Would-be marijuana purchasers shipped cash payments through the United States Mail to various post office boxes controlled by the GILLUM DTO throughout the Sacramento region.  Once the cash payment was received, the GILLUM DTO would in return ship the selected type and quantity of marijuana to the purchaser.  Between August 2012 and July 2013, the GILLUM DTO distributed at least 600 pounds of marijuana.

19.    In preparation for sentencing, GILLUM was interviewed by a federal probation officer. GILLUM reported his only assets as two checking accounts worth $2,500 and a 2001 Toyota Tundra worth $5,117.  GILLUM did not disclose any ownership of Bitcoin.

20.    After GILLUM was interviewed by the Probation Officer, but before the imposition of judgement and sentencing, as noted below, the United States discovered two previously undisclosed

---

[3] As set forth above in  paragraph 11, Silk Road was an online marketplace on the dark web or darknet that sold illegal narcotics, such as marijuana, and other contraband.

Bitcoin exchange accounts (Tradehill, Inc. Accounts) that were controlled by GILLUM and contained cash valued at over $250,000 and Bitcoin valued over $480,000.  As discussed in greater detail below, federal law enforcement was able to successfully seize the undisclosed cash and Bitcoin.

21.     According to the filed Judgement, on November 9, 2015, the Honorable United States District Court Judge Morrison C. England, Jr., sentenced GILLUM to a term of imprisonment of 108 months.

**B. Tradehill, Inc. Accounts**

22.     After GILLUM pled guilty and admitted to operating on the Silk Road market, in September 2014, federal law enforcement became aware of a previously unknown account held by GILLUM at Tradehill, Inc., a FinCEN registered virtual currency exchanger, similar to Coinbase and Kraken.  As discussed more fully below, during the previous federal criminal investigation of GILLUM by the United States Postal Inspection Service, law enforcement agents believed GILLUM controlled a substantial amount of virtual currency that was earned while selling illegal narcotics on the Silk Road marketplace, but were unaware of its location.

23.     In or about August 2013, Tradehill, Inc. paused its virtual currency exchange business because of issues concerning regulatory and banking oversight.  Following the business pause, Tradehill, Inc. lost funding and entered liquidation proceedings.  Tradehill, Inc.'s  assets were at the time held in trust and subject to liquidation by, among others, the Law Office of Pierre G. Basmaji.

24.     On or about September 5, 2014, the United States Attorney's Office, Eastern District of California received a letter from Law Office of Pierre G. Basmaji.  The "RE" section of letter stated, "United States v. Matthew Gillum, 2:13-cr-00393-MCE."  In part, the letter stated, "Two days ago, the mother of Matthew Gillum emailed Tradehill asking for the return of Mr. Gillum's property held by the company because Mr. Gillum was in jail."  Federal law enforcement agents interviewed Pierre G. Basmaji after attorneys with the United States Attorney's Office, Eastern District of California received his letter.  Mr. Basmaji told federal law enforcement agents that GILLUM opened accounts, transferred funds, and traded/purchased Bitcoin using Tradehill, Inc.  GILLUM's account at Tradehill, Inc. – the account in his own name – was currently frozen and Mr. Basmaji had agreed to liquidate the account – including all remaining Bitcoin – once served with a seizure warrant.

6

25.     On October 17, 2014, federal law enforcement agents became aware of a second Tradehill Inc. account connected to GILLUM held in the name of Megan Thompson, GILLUM's sister. The account held in Megan Thompson's name was opened on or about April or May of 2013, during the time GILLUM's drug scheme was active.

26.     Tradehill Inc. and its liquidators attempted to contact Megan Thompson when they lost funding in late 2013, but all those attempts were unsuccessful.   In September of 2014, however, Tradehill Inc., through Mr. Basmaji, received email correspondence believed to be from Megan Thompsons, via Megan_Thompson88@yahoo.com, inquiring about a Tradehill Inc. account in her name.

27.     In the email communications between Mr. Basmaji and Thompson, Thompson stated that her brother, Matthew Gillum, "set the account up" and she "did not have access to the account until recently."  According to Ms. Thompson, GILLUM "handled everything" for the Tradehill account and said that "bitcoins were a great investment."  Thompson acknowledged that GILLUM provided the money and bitcoin that funded the account.

28.     On October 17, 2014, federal law enforcement agents conducted a telephone interview with Mr. Basmaji.  Mr. Basmaji stated that the two accounts – GILLUM's and Thompson's – appeared to have similar financial and trading activity.  Specifically, in late July 2013, the trading activity for both accounts abruptly stopped.  This stoppage coincided with GILLUM's arrest for violating federal drug trafficking laws.  Also, GILLUM was detained in Sacramento County Jail since his arrest, based on his two previous felony convictions and flight risk.

29.     On October 22, 2014, IRS-CI Special Agent Lisa Ulrikson obtained a seizure warrant and seized $200,979.15 seized from Tradehill, Inc., held in the name of Megan Thompson and $53,302.06 seized from Tradehill, Inc., held in the name of Matthew Gillum.  Furthermore, on November 24, 2014, IRS-CI Special Agent Lisa Ulrikson obtained a second seizure warrant and seized 1,238.6004395 Bitcoins valued at approximately $464,772.43 seized from Tradehill Inc., held in the name of Megan Thompson and 55.87584198 Bitcoins valued at approximately $20,996.85 seized from Tradehill, Inc., held in the name of Matthew Gillum.  Based on the February 27, 2024 spot price of Bitcoin of $51,525.77, the Bitcoin seized from GILLUM would be valued at approximately $66 million today.

7

**C. False Declaration Prepared by GILLUM Signed Under Penalty of Perjury.**

30.      Approximately 25 months into GILLUM's 108-month federal prison sentence, as part of the civil proceeding regarding the seized cash and Bitcoin from Tradehill, Inc., discussed above in Paragraph 22, under penalty of perjury, GILLUM drafted and signed a "Declaration of Matthew Gillum" and an "Answer to Complaint" and filed them with the United States District Court for the Eastern District of California.  *See 2:14-CV-02950-MCE, ECF 28.*  A review of the Declaration revealed that GILLUM knowingly made false statements regarding his income and acquisition of Bitcoin.

31.      As discussed in greater detail below in regards to the "Answer to Complaint" containing numerous knowingly false statements regarding GILLUM's income and acquisition of Bitcoin, I believe the "Answer to Complaint" contained truthful information on occasion when GILLUM believed he did not need to lie about a topic.  For example, in regards to the approximately $200,979.15 in cash and 1,238.6004395 Bitcoins, both seized from Tradehill, Inc., both held in the name of Megan Thompson, GILLUM stated in his Declaration to the United States District Court that, "Around May 1st 2013 I created an account on the Tradehill exchange in the name of my sister Megan Thompson without her knowledge from the e-mail address Megan_Thompson88@yahoo.com I asked her for her driver's license and bank info without telling her why which I used to verify the account." ECF 28 at 11.  The relevance of this admission by GILLUM will be discussed in greater detail in regards to the laundering of drug proceeds via Bitcoin after GILLUM was released from federal prison.

32.      In the Answer, GILLUM claimed that, "Between the dates of Jan. 1st 2011 and July 1st 2011 I purchased approximately 15,000 Bitcoins for $20,500 with legitamite (sic) income."  ECF 28 at 9.  GILLUM further claimed that "I did not make adds or receive payment in Bitcoin on the Silk Road website." ECF 28 at 14.  And that, "At no time did I furnish or intend to be furnished a controlled substance for Bitcoins." ECF 28 at 14.  These claims are untrue.  As discussed in greater detail below, between March 11, 2013 and March 14, 2013, GILLUM withdrew 12,056 Bitcoin from the Silk Road marketplace to an external Bitcoin wallet.  Based on this investigation, I believe GILLUM made affirmative, material misrepresentations to the District Court regarding his ownership of Bitcoin.

33.      It appears that GILLUM was at the same time trying to hide his Bitcoin from discovery by federal law enforcement.  In the "Answer to Complaint", GILLUM wrote, "The usernames and

passwords to the five bitcoin wallets on blockchain.info I kept written down on a piece of paper in my nightstand next to my bed. I have no idea where this piece of paper is now." ECF 28 at 13.  In reviewing telephone calls GILLUM made shortly after his arrest, during a call between GILLUM and B.W. (GILLUM's girlfriend at the time and the mother of his child) that occurred on July 29, 2013, approximately one day after GILLUM was arrested, GILLUM asked B.W. (approximately 4:20 minutes into the conversation) about "the drawer next to my bed."  GILLUM asked, "What all's in that still?" B.W. responded that there was a knife next to an envelope and GILLUM said, "Hold onto everything." B.W. responded, "Is it still" and GILLUM audibly shushed B.W. and said, "This call's recorded, you remember that babe."  GILLUM then told B.W. to "keep all that stuff safe." Based upon the facts of this case, I believe that GILLUM was asking B.W. to retrieve the usernames and passwords to his five Bitcoin wallets, that GILLUM years later described in his "Answer to Complaint" to the United States District Court were "on a piece of paper in my nightstand next to my bed."

34.     Also according to jail recordings, B.W. also made an in-person visit to GILLUM on that same day (July 29, 2013).  During such an in-person visit at the Sacramento County Jail (where GILLUM was incarcerated at the time), GILLUM and his visitor were separated by glass. The audio from that visit revealed several times during that meeting in which both GILLUM and B.W. stopped talking and appeared to be attempting to communicate without speaking. After several such instances took place, B.W. told GILLUM "I'll send you a book on sign language."   I believe this was a reference to B.W. wanting to help GILLUM better communicate with visitors without law enforcement being able to eavesdrop on such conversations.

**D.  Silk Road Marketplace Taken Down by the FBI**

35.     In October 2013, the FBI arrested the founder of the Silk Road marketplace and shutdown the Silk Road marketplace operating on the darknet market.  As a result of this enforcement action, the FBI was able to seize substantial sums of evidence, which included among other things who was operating as a seller on the Silk Road marketplace, encrypted email communications between the sellers and buyers of illegal narcotics and other contraband being sold on the Silk Road marketplace, and wallet addresses associated to parties on the Silk Road marketplace.  The only source of payment for the illegal narcotics and other contraband being sold on the Silk Road marketplace was by Bitcoin.

9

36.     A query was conducted for encrypted email communications from the datasets obtained from the seized evidence from the Silk Road marketplace for GILLUM's known vendor name "sourdieselman." Contrary to GILLUM's "Answer to Complaint" signed by GILLUM under penalty of perjury, the queried results showed email communications between GILLUM and buyers from the time period before he was arrested in 2013 showing instances of him accepting Bitcoin as form of payment for the marijuana.  For example, on January 6, 2013, "Diss0lve" sent "sourdieselman" an email and stated, "What is your future off site email contact for further sales? will you still accept bitcoin as a payment method?"  On January 6, 2013,  "Sourdieselman" responded and stated, "My offsite email is nevertellonme@tormail.org Ill keep accepting btc as long as I can cash them out. It seems to be easier than it used to be so we ll see. you can allways hit me up over there for other options."

37.     In another example, on January 12, 2013, "Diss0lve" sent "sourdieselman" an email and stated, "I'm a little short on BTC[4] for a pound of outdoor, I'm short 60 USD, have 2500 USD worth in BTC. Think you can help a brotha :P I bought a pound listing a couple days ago and I just got another half P listing in the po box today . . . so this will be my 3rd transaction with you."  On January 12, 2013, "Sourdieselman" responded and stated, "ya ill do it this one time."[5]

38.     In another example, on March 3, 2013, "griffin420" sent "sourdieselman" an email and stated, "I paid 25 BTC which when I finalize, will equal $850 at today's market price. I was looking to be awed at the service your providing. I understand the mistake that happened, I just want it made right At this point I have to win back the respect of my customer(s) with phenomenal product, whom I handed a bag of mids. 2 OZ of your Best Indoor and a half oz of your hash, shipped out on Monday. When I receive these two, I will feel comfortable leaving the community with a 5/5 for making this situation right. However I will not make mention of the lost package, reship(s). Just that the service and product I received was nothing short of fantastic. Thanks, G420.  On March 13, 2013, "sourdieselman" responded to the email and stated, "ya fine send me an address."

39.     In another example, on March 6, 2013, "BillyBlanko120" sent "sourdieselman" an email

---

[4] BTC is the abbreviation for Bitcoin.

[5] $2,500 worth of Bitcoin on this date would have represented GILLUM receiving approximately 178 Bitcoin for this marijuana sale.

ATTACHMENT C to Search Warrant   Prior Aff---2:24-MJ-0023-JDP

1 and stated, "Ho SDM, I have 75 BTC can I get an lb and a qp?   On March 6, 2013, "sourdieselman"

2 responded and stated, "lb and qp of what? Just look at my listings and calculate that math."

3      40.      In addition to GILLUM receiving Bitcoin from customers on the Silk Road marketplace

4 in exchange for marijuana as described above, according to the encrypted email communications seized

5 by the FBI from the Silk Road marketplace, law enforcement observed an email communication

6 between GILLUM (sourdieselman) and a user using the moniker "CaptainMal".  Said email

7 communication discussed GILLUM wanting to sell Bitcoin for cash as follows.  On December 31, 2012,

8 "sourdieselman" sent "CaptainMal" an email and stated, "I would like to cash out my btc with you. If I

9 send you btc you will mail me cash. Am I correct?  On December 31, 2012, "CaptainMal" responded to

10 the email and stated, "Yes, you are correct. I'm doing this same thing for about five other vendors. How

11 much are you hoping to cash out? And are you hoping to cash out the entire amount, or to do it in

12 chunks? Let me know some more details, if you have time! :)" On December 31, 2012, "sourdieselman"

13 responded to the email and stated, "Im just comming back after a long break. I have about 6k in coin and

14 another 6k in escrow that will clear in a few days. Id like to send you 6k now and eventually just send

15 you a block of 10k every time I have it. How much coin do you move? How long would I have to wait

16 after sending coin before my cash is in the mail."  On December 31, 2012, "CaptainMal" responded to

17 the email and stated, "To be honest, it's hard to estimate because I have another vendor who is hoping

18 for the same service, so that'll mean another large bunch. It's been slow the last few days (well, since

19 Christmas, really) so I don't quite know what to expect. I could definitely do 6k and send the cash out

20 for you on Thursday to get to you on Friday of this week. I only say that because I have $5k going out

21 on Wednesday, and I won't be filling any new orders until Wednesday - which means no coins selling

22 until then. Would sending out $6k on Thursday be soon enough?"  On December 31, 2012,

23 "sourdieselman" responded to the email and stated, "ya that s fine. I just don't want to be waiting weeks.

24 The mt gox weighted avg this very minute is 13.48 so if I send you 445.1 BTC you will send me 6k cash

25 in the mail on thursday. Give me the go and ill send it over."

26  **E.  After being released from the Bureau of Prison, GILLUM began to try to access Bitcoin**

27      **that he had obtained prior to his arrest.**

28      41.      On April 8, 2022, I obtained a federal search warrant for GILLUM's email account

mgillum@email.com serviced by 1 & 1 Mail & Media, Inc.  *See 2:22-sw-0269 CKD.*  According to 1 & 1 Mail & Media, Inc. records, GILLUM opened the email account on November 3, 2019, almost immediately following his release from federal prison.  Furthermore, according to  1 & 1 Mail & Media, Inc. records, after GILLUM created the email account, he contacted several email accounts from his mgillum@email.com account in an attempt to obtain access to Bitcoin he had obtained before his incarceration in 2013, and/or to cash-out these Bitcoin.  Some examples of those communications are as follows:

- On November 3, 2019, (the same date the mgillum@email.com account was created) GILLUM sent an email to blockchain.com reading, "I created a Bitcoin wallet here on 2013 and then went to prison for over six years. Back then I didn't have to provide anything. I just made an alias identifier and a password. I still remember both." GILLUM then wrote, "I would be willing to pay You if you could track down the wallet id. All I know is that I created the wallet some time in 2013 before July 24th. The password is thisisalongfuckingpassword".;

- On December 15, 2019, GILLUM sent an email to walletrecoveryservices@gmail.com that read "I made a wallet at blockchain.info back in 2013 with an alias identifier of meg[6] and a password of thisisalongfuckingpassword now blockchain.info is blockchain.com and they say they have no record of that wallet. I don't know if you can search for the wallet id if you have the password for it. It had 100btc in it."; and

- On December 5, 2019, GILLUM sent an email to brooke@grayscale.com stating, "Brooke Thank you for responding. I am actually in the opposite situation. I own 181 BTC that I will be looking to liquidate in 2021. Please let me know if Grayscale would be interested. Thanks Matt."

## F.  GILLUM Money Laundering Drug Proceeds Post Incarceration

42.     As set forth above, in October 2013, the FBI arrested the founder of the Silk Road

---

[6] The "Meg" alias identifier chosen by GILLUM was in reference to his sister Megan Thompson. As stated above, GILLUM admitted to creating a Tradehill, Inc. account in Megan Thompson's name without her knowledge and linked the email account in that name megan_thompson88@yahoo.com to the Tradehill, Inc. account.

marketplace and shutdown the Silk Road marketplace operating on the darknet market.  According to transaction records within the Silk Road marketplace data set, vendor SOURDIESELMAN (aka GILLUM) withdrew 12,056 Bitcoins to several addresses within an external Bitcoin wallet in a series of 26 transfers between March 11, 2013 and March 14, 2013.

43.     Following the withdrawal of 12,056 Bitcoin, between April 2, 2013, and April 10, 2013, 8,682 of the 12,056 Bitcoin were deposited into an account at the Mt. Gox cryptocurrency exchange account, which according to Mt. Gox records, had been registered with an email address megan_thompson88@yahoo.com.[7]

44.     According to Mt. Gox records, on May 31, 2013, 606 Bitcoins were withdrawn from the Megan Thompson Mt. Gox to external wallet addresses.  These Bitcoins (606) transited with several other Bitcoin addresses and the Bitcoin had primarily not been moved/accessed until the beginning of December 2020.  Subsequently, between December 9, 2020 and March 23, 2021, 180 of the 606 Bitcoins were sent in five transactions to a wallet address ending in 4FQgUb.  The following is a chart that shows the date of the transaction and the amount of Bitcoin:

| DATE | AMOUNT of BTC |
|---|---|
| 12/09/2020 | 20.999 |
| 01/01/2021 | 80.00 |
| 01/13/2021 | 20.00 |
| 02/02/2021 | 40.00 |
| 03/23/2021 | 19.29 |

45.     According to Payward Ventures (Kraken) records, the wallet address ending in 4FQgUB belonged to an account registered to GILLUM.  According to Kraken records, after the 180 Bitcoin were transferred into GILLUM's account, GILLUM either sold the Bitcoin and converted the Bitcoin to fiat

---

[7] As set forth above, GILLUM admitted in an Answer to the United States District Court for the Eastern District of California to using the email address megan_thompson88@yahoo.com to open a Tradehill account in his sister's name, Megan Thompson, using the email account without her consent or knowledge.

currency or purchased other forms of virtual currency.

46.     For example, in regards to the 20.999 Bitcoin transferred on December 9, 2020, approximately 12 minutes after the Bitcoin was transferred into GILLUM's wallet, GILLUM sold the 20.999 Bitcoin and received $383,523.50 into his Kraken account.  According to Kraken records, after GILLUM sold the Bitcoin, between December 9, 2020 and December 17, 2020, GILLUM transferred $382,607 of the $383,523.50 into a bank account ending in 8324[8], in violation of 18 U.S.C. § 1957.  The following is a chart showing the date of transfer and the dollar amount:

| DATE | DOLLAR AMOUNT (LAUNDERED DRUG PROCEEDS) |
|------|------------------------------------------|
| 12/09/2020 | $99,996.00 |
| 12/14/2020 | $99,996.00 |
| 12/14/2020 | $99,996.00 |
| 12/17/2020 | $82,619.00 |

47.     In another example, in regards to the 80.00 Bitcoin transferred on January 1, 2021, into GILLUM's wallet, that same day, GILLUM sold the 80.00 Bitcoin and received $2,321,450 into his Kraken account.  According to Kraken records, after GILLUM sold the Bitcoin, between January 5, 2021 and January 13, 2021, GILLUM transferred $1,948,681.52 of the $2,321,450 into a bank account ending in 8324, in violation of 18 U.S.C. § 1957.  The following is a chart showing the date of transfer and the dollar amount:

| DATE | DOLLAR AMOUNT (LAUNDERED DRUG PROCEEDS) |
|------|------------------------------------------|
| 01/05/2021 | $99,996.00 |
| 01/11/2021 | $599,388.52 |
| 01/13/2021 | $999,996.00 |
| 01/13/2021 | $249,301.00 |

51.     According to Redwood Credit Union records for bank account ending in 8324, after the

---

[8] According to Redwood City Credit Union records, GILLUM has sole signature authority over the bank account.

drug proceeds were laundered from GILLUM's Kraken account into his Redwood Credit Union bank account, on January 19, 2021, GILLUM conducted an outgoing wire in the amount of $1,500,000 to TD Ameritrade, in violation of 18 U.S.C. § 1957.  According to TD Ameritrade records, the incoming wire was received into the trading account of GILLUM's mother, Donna Gillum.

**G. Additional Laundering of Drug Proceeds by GILLUM Utilizing another Family Member Used to Purchase a Penthouse Condominium**

52.     According to Firm Title Corporation records, on December 30, 2021, GILLUM's sister, Catherine Gillum, purchased a beachfront condo located at 16275 Collins Avenue, #2601, Sunny Isles, Florida, for $2,150,000.  According to the Settlement Statement, Catherine Gillum did not have to obtain a loan(s) to secure the property as the property was paid in full.[9]

53.     As described below, Catherine Gillum used drug proceeds to purchase the condo that can be directly traced back to Bitcoin earned by GILLUM operating on the Silk Road marketplace utilizing his vendor name SOURDIESELMAN.

54.     According to Firm Title Corporation records, on December 30, 2021, the escrow account for the 16275 Collins Avenue, #2601 property received a wire in the amount of $1,948,454.42.  The incoming wire into the escrow account came from Wells Fargo Bank account number ending in 7069.[10]

55.     According to Wells Fargo Bank records, the sole authorized signer for bank account number ending in 7069 is Catherine Gillum.  Furthermore, according to Wells Fargo Bank records, Catherine Gillum opened bank account number 7069 on July 16, 2021, and the bank account is held in the name of MG PROTECTION TRUST CATHERINE A GILLUM TTE.

56.     According to Well Fargo Bank records for bank account ending in 7069, on the following dates, the bank account received incoming wires from Kraken, totaling $1,995,789:

- December 27, 2021 - $498,996

---

[9] According to an open internet search, the Collins Avenue property is currently for sale at $2,598,000 and has been on the market for 81 days.

[10] According to Firm Title Corporation records, on December 23, 2021, the escrow account for the 16275 Collins Avenue, #2601 property received an incoming wire in the amount of $215,000 from Lang Realty, Inc located in Boca Raton, Florida.  The purpose of the wire was for the "deposit or earnest money" to purchase the condo.  Due to the covert status of the investigation, law enforcement could not serve legal process on Lang Realty, Inc to determine the source of the wire in the amount of $215,000.

1        • December 27, 2021 - $498,958

2        • December 28, 2021 - $498,941

3        • December 29, 2021 - $498,894

4    57.    According to Wells Fargo Bank records for bank account ending in 7069, after the four

5    incoming wires are received, on December 30, 2021, Catherine Gillum sent an outgoing wire in the

6    amount of $1,948,454.42 to Firm Title Corporation for the purchase of the condo located at 16275

7    Collins Avenue, #2601.

8    58.    According to Kraken records, the source of the incoming wires from Kraken into

9    Catherine Gillum's Wells Fargo Bank account ending in 7069 came from a Kraken account held in the

10   name of Catherine Gillum.  An analysis of the source of the funds in Catherine Gillum's Kraken account

11   at the time she sent four wires totaling $1,995,789 from her Kraken account into her Wells Fargo Bank

12   account ending in 7069 can be originally traced back to Bitcoin earned by GILLUM operating on the

13   Silk Road marketplace utilizing his vendor name SOURDIESELMAN.

14   **H.  U.S. Custom Border Protection International Travel Records Associated to GILLUM**

15   60.    On January 12, 2024, I obtained the U.S. border crossing records from the U.S. Custom

16   and Border Protection (CBP) related to GILLUM.  Among other things, CBP is responsible for

17   facilitating lawful international travel.  The records from CBP related to GILLUM showed extensive

18   international travel from November 1, 2021 to the date of this affidavit.

19   61.    The CBP records related to GILLUM, included but were not limited, to the date

20   GILLUM left the U.S. or entered the U.S., name of the airline carrier traveled on, flight number, arriving

21   location, and departing location.  According to CBP records, GILLUM left the U.S. by airplane thirteen

22   times and traveled into airports located at Cancun, Mexico, Mexico City, Mexico, Cartagena, Colombia,

23   San Salvador, El Salvador, Bogota, Colombia, Atlántico, Colombia, Managua, Nicaragua, Medellin,

24   Colombia, and Quito, Ecuador.

25   62.    On December 11, 2023, CBP conducted a secondary search of GILLUM upon him

26   landing into Miami airport from a flight originating in Medellin, Colombia.  During the secondary

27   search, GILLUM told the CBP Officer that he is a landlord in South Florida, but lives alone with his two

28   children in Nicaragua.

16

63.     According to CBP records, the last known border crossing by GILLUM occurred on January 17, 2024, when GILLUM flew out of Miami airport to Atlántico, Colombia. Furthermore, according to CBP records, on February 27, 2024, GILLUM is expected to arrive back at the Miami airport on American Airlines flight 1124 from Atlántico, Colombia.

## V.     REQUEST FOR SEALING

64.     I  request that the Court order that all papers in support of this application, including the affidavit, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets and subjects of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets and subjects an opportunity to flee, continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.  Specifically, if GILLUM were made aware of this investigation, he would likely flee from prosecution to a foreign country, destroy evidence, and hide assets subject to seizure.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

## VI.   CONCLUSION

65.   Based on the facts set forth above in this Affidavit, I believe that there is probable cause that GILLUM committed Title 18, U.S.C. § 1957 (engaging in a monetary transaction in criminally derived property).  Accordingly, I respectively request that the Court issue an arrest warrant for GILLUM.

I swear, under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

/s/ Christopher Scott Fitzpatrick

Christopher Scott Fitzpatrick
Special Agent
IRS-CI

Subscribed and sworn to before me
telephonically on February 28, 2024:

The Honorable Jeremy D. Peterson
UNITED STATES MAGISTRATE JUDGE

Approved as to form by AUSA JUSTIN LEE

18

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Items seized from Matthew Gillum on February 28, 2024 | )<br>)<br>)<br>)<br>)<br>) |

Case No.    **2:24-sw-0220 DB**

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____EASTERN_____ District of _____CALIFORNIA_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____March 15, 2024_____
*(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.      ☑ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
_any duty magistrate judge_ .
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30).*

☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    03/01/2024, 10:54am

City and state:    Sacramento, California

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Subscribed, sworn to, and returned before me this date.

_____    _____
*Signature of Judge*                                        *Date*